UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | | |
|---|---|---|
| MARY R., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  2:21 CV 60 JMB |
| | ) | |
| | ) | |
| KILO KIJAKAZI, | ) | |
| Commissioner of Social | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This action is before the Court pursuant to the Social Security Act, 42 U.S.C. §§ 401, et

seq. ("the Act").  The Act authorizes judicial review of the final decision of the Social Security

Administration denying Plaintiff Mary R.'s ("Plaintiff") application for disability benefits under

Title II of the Social Security Act,  see 42 U.S.C. §§ 401 et seq. and for disabled widow's benefits.

All matters are pending before the undersigned United States Magistrate Judge with the consent

of the parties, pursuant to 28 U.S.C. § 636(c).  Substantial evidence supports the Commissioner's

decision, and therefore it is affirmed.  See 42 U.S.C. § 405(g).

I.   **Procedural History**

On May 23, 2019, Plaintiff filed an application for disability benefits, arguing that her

disability began on November 27, 2017, as a result of bipolar, post-traumatic stress disorder

("PTSD"), diabetes, arthritis, back problems, high blood pressure, thyroid problems, and anxiety.

(Tr. 97-98, 209-17)  On April 4, 2019, Plaintiff also filed a Title II application for disabled widow's

benefits, alleging disability beginning on November 27, 2017, and asserting the same disabling

impairments.   (Tr. 218-23)  After Plaintiff's claims were denied upon initial consideration, she

1

requested a hearing before an ALJ.  (Tr. 132-36)  On August 12, 2020, Plaintiff appeared at a telephone hearing (with counsel), and testified concerning the nature of her disability, her functional limitations, and her past work.  (Tr. 38-79)  The ALJ also heard testimony from Vocational Expert ("VE") Delores Gonzalez.  The VE opined as to Plaintiff's ability to perform her past relevant work, based upon Plaintiff's functional limitations, age, and education.  (Id.) After considering Plaintiff's testimony and the VE's testimony, and after reviewing the other relevant evidence of record, the ALJ issued a decision on September 28, 2020, finding that Plaintiff was not disabled, and therefore denying benefits.  (Tr. 13-38)

Plaintiff sought review of the ALJ's decision before the Appeals Council of the Social Security Administration.  (Tr. 1-6)  On July 22, 2021, the Appeals Council denied review of Plaintiff's claims, making the September 28, 2020, decision of the ALJ the final decision of the Commissioner.  Plaintiff has therefore exhausted her administrative remedies, and her appeal is properly before this Court.  See 42 U.S.C. § 405(g).

As explained below, the Court has considered the entire record in this matter.  Because the decision of the Commissioner is supported by substantial evidence, it will be affirmed.

## II.   Medical Records

The administrative record before this Court includes medical records concerning Plaintiff's health treatment from January 10, 2017, through July 1, 2020.  The Court has considered the entire record.  The following is a summary of pertinent portions of the medical records relevant to the matters at issue in this case.

### A.   Palmyra Clinic – Dr. David Ouellette, NP Tonya Stamper, and NP Traci Kline
(Tr. 331-51, 572-76)

From January 10 to September 5, 2017, Dr. Ouellette and Nurse Practitioners Stamper and Kline treated Plaintiff's diabetes, hyperlipidemia, and substance abuse at the Palmyra Clinic.

On January 10, 2017, Plaintiff presented to establish care and for medication refills. Dr. Ouellette noted Plaintiff had been taking oxycodone for three years for her back pain. Dr. Ouellette refilled her oxycodone prescription, prescribing four dosages a day, prescribed physical therapy for chronic low back pain, and ordered a psychiatry consultation to treat Plaintiff's anxiety disorder. Physical examination showed a normal gait, no joint instability, and normal muscle strength and tone.

NP Stamper treated Plaintiff for bronchitis on January 16, 2017. Plaintiff reported having bronchitis frequently due to her smoking. On March 21, 2017, Plaintiff reported having bronchitis and requested an oxycodone refill to avoid returning in two weeks and paying another copay.

On April 7, 2017, Plaintiff returned for a pain medication refill. Dr. Ouellette's examination showed an abnormal back, but normal gait, normal range of motion, and muscle strength and tone. Dr. Ouellette refilled Plaintiff's oxycodone prescription, including a no refill before June 7, 2017, notation. Plaintiff declined to have an order for physical therapy for her chronic back pain due to the cost of therapy.

On August 4, 2017, Plaintiff  reported starting oxycodone in 2013 for low back pain, and that her pain was well controlled. Plaintiff noted that her diabetes was not well controlled. NP Kline encouraged Plaintiff to stop smoking, but Plaintiff explained she could not because of the stress from raising her grandchildren and living with an alcoholic husband. A diabetic foot examination showed normal and not tender feet with a full range of motion. Plaintiff requested an oxycodone refill. In follow-up treatment on September 5, 2017, Plaintiff reported drinking six to eight beers each day. Plaintiff's urine drug screen showed no opiates in her system so NP Kline would not prescribe oxycodone. NP Kline explained that the clinic would no longer prescribe Plaintiff this medication, and Plaintiff responded by becoming tearful and upset and stated that

"she is addicted to the oxycodone and needs it in order to work and take care of her grandkids, unable to believe we could stop this medication." (Tr. 573)  NP Kline noted that Plaintiff became tearful and upset regarding this decision and noted that Plaintiff was addicted to oxycodone. Plaintiff explained that she needed the medication so she could work and care for her grandchildren.  NP Kline discussed addiction treatment and her rational for refusing to prescribe oxycodone and encouraged Plaintiff to seek treatment.  Although NP Kline offered to assist Plaintiff with drug addiction treatment, Plaintiff declined her offer.  NP Kline noted that Plaintiff walked out of the examination room in an agitated state once she learned that NP Kline would not prescribe oxycodone. During treatment on September 5, 2017, Plaintiff reported drinking heavily, six to eight beers each day, and requesting an oxycodone refill.

> **B.**      **Hannibal Free Clinic – Dr. Adam Samaritoni** (Tr. 351-60, 402-06, 577-88)

On March 27 and 28, 2019, Dr. Adam Samaritoni treated Plaintiff's diabetes, hypertension, and hyperlipidemia at the Hannibal Free Clinic.

On March 27, 2019, Plaintiff presented as a new patient and reported having been off her medications for six months, and having been diagnosed with PTSD, manic depressive disorder, anxiety, and panic disorder.  Plaintiff reported drinking 64 ounces of sweat tea and 64 ounces of strawberry daiquiris per day.  During the March 28, 2019, visit, Plaintiff received a mental health referral to Clarity for counseling and psychiatric care.  Plaintiff refused to schedule a follow-up appointment.

> **C.**      **Clarity Healthcare – Dr. Joseph Spalding** (Tr. 362-75, 396-401, 486-571)

From May 9, 2019, to July 1, 2020, Dr. Joseph Spalding treated Plaintiff's PTSD and depression.

On May 9, 2019, Dr. Spalding completed a psychiatric diagnostic evaluation.  Plaintiff

4

reported feeling depressed, self-mutilating, and not using drugs or alcohol.  Plaintiff indicated that her deceased husband was an alcoholic and drug addict and was physically and emotionally abusive.  Plaintiff's history included mood swings, racing thoughts, impulsivity, depressed mood, panic attacks, and decreased energy and motivation.  Plaintiff explained that she had been living with her sister because she was frightened to sleep at home alone.  Dr. Spalding diagnosed Plaintiff with chronic bipolar disorder, moderately severe depression, and panic disorder, and prescribed oxycodone, trazodone, and vraylar, and encouraged Plaintiff to exercise and stop smoking.

In follow-up treatment on June 7, 2019, Plaintiff reported living with her sister since finding her deceased husband on the bedroom floor on April 4.  Dr. Spalding increased her trazodone and vraylar doses.  On July 10, 2019, Plaintiff complained of difficulty concentrating, feeling down and guilty, and little interest in doing anything.  Plaintiff admitted that after taking her son's adderall for two days, she had been able to sleep, sit, and visit with relatives during a family reunion.  Plaintiff reported that for the last two years, she had been responsible for the care of her grandchildren while their mother was incarcerated, and prior to that time, she worked in mental health from 2008 to 2015.  Dr. Spalding instructed Plaintiff to stop smoking, to exercise, and to monitor her diet.  Dr. Spalding adjusted Plaintiff's medication regimen by adding adderall. Dr. Spalding diagnoses included severe bipolar disorder and chronic alcohol disorder.  On August 1, 2019, Plaintiff reported that the addition of adderall to her medication regimen was like a miracle and enabled her to sit, focus, and stay on task and be her old self.  Dr. Spalding's mental status examination showed Plaintiff's mood to be euthymic, thought process logical, and perception, insight, thought content, and judgment were within normal limits, and cognition impaired.  Dr. Spalding adjusted Plaintiff's medication regimen.

In follow-up treatment on September 12, 2019, Plaintiff reported feeling depressed and had

little interest in doing anything.  Plaintiff reported not having manic or psychotic symptoms.  Dr. Spalding's mental status examination was unremarkable.  On November 7, 2019, Plaintiff reported feeling that her therapy was going well and helping with her co-dependency issues.  Dr. Spalding's mental status examination was generally normal with her thought process, cognition, insight, and judgment all within normal limits.  Dr. Spalding added trazodone to Plaintiff's medication regimen and encouraged her to exercise and stop smoking.  In follow-up treatment on December 3, 2019, Plaintiff reported celebrating Thanksgiving at her daughter's home.  Plaintiff reported that her medications seem to be working.

Plaintiff returned on January 23, 2020, and reported having difficulty concentrating and increased anxiety and feeling depressed after she stopped taking adderall.  Dr. Spalding's mental status examination was unremarkable.  Dr. Spalding added trintellix to Plaintiff's medication regimen and encouraged her to exercise and stop smoking.  On February 20, 2020, Plaintiff reported having a new boyfriend who would be living with her, being anxious about their relationship, and not having any manic or psychotic symptoms.  Dr. Spalding's mental status examination was generally normal with her cognition, insight, and judgment all within normal limits and her thought process was logical.  Plaintiff reported that adderall improved her focus and her ability to stay on task.

On April 23, 2020, Dr. Spalding noted that therapist "Susan MacDonough said that [Plaintiff] has been drinking more, smoking MJ daily and not taking meds as prescribed.  Mood has worsened and her obsessive thinking has worsened.  She has also been engaging in self harm behaviors."  (Tr. 513)  Plaintiff admitted that she had stopped taking all of her medications,  and had been drinking excessively and smoking marijuana daily.  Plaintiff reported that she had started taking her medications again and falling over a glass table while intoxicated.  Dr. Spalding's mental

status examination was unremarkable.  Dr. Spalding restarted Plaintiff's medication regimen and recommended Plaintiff stop drinking alcohol.  Plaintiff returned on May 6, 2020, and reported feeling better after restarting her medications and stopping alcohol consumption.  Plaintiff reported therapy going well and her mood improved.  Dr. Spalding found Plaintiff did not have any manic or psychotic symptoms.  Dr. Spalding adjusted Plaintiff's medication regimen.  On June 3, 2020, Plaintiff reported having increased anxiety and panic attacks and stealing items from stores four times.  Dr. Spalding's mental status examination was generally normal with her cognition, insight, and judgment all within normal limits and her thought process was paranoid.

On July 1, 2020, Plaintiff reported living with her boyfriend.  Dr. Spalding's mental status examination showed Plaintiff's mood to be depressed/anxious, thought process and content logical, and perception, cognition, insight, and judgment within normal limits.  Dr. Spalding increased Plaintiff's trazodone dosage as needed for sleep and continued her other medications.

**D.**    **Mark Twain Area Counseling Center – Nurse Teresa Kendrick** (Tr. 377-95, 428-35)

From April 22 to October 17, 2019, Nurse Teresa Kendrick coordinated Plaintiff's care with Hannibal Free Clinic and provided case management services.  Nurse Kendrick noted that Hannibal Free Clinic would cover Plaintiff's expenses for mental health treatment as a current patient.

On April 23, 2019, Nurse Kendrick traveled to Plaintiff's home as Plaintiff lacked funds for gas money and helped complete an application for a home improvement grant.  On April 29, 2019, Nurse Kendrick noted that she would request medication management appointments and therapy.  On May 1, 2019, Nurse Kendrick assisted Plaintiff in completing her Medicaid application.  On May 9, 2019, Nurse Kendrick accompanied Plaintiff to her first psychiatric appointment with Dr. Spalding.

### E.      **Hannibal Medical Group** (Tr. 415-27)

From December 5, 2017, to April 5, 2019, Plaintiff received treatment at the Hannibal Medical Group.

On December 5, 2017, Plaintiff presented complaining of cold and cough symptoms, reported being out of all of her medications for six months, and having custody of her grandchildren for a few years.  Plaintiff explained that her grandchildren recently moved back with their mother and since then she has had difficulty with depression and sleep and not wanting to leave home.

On June 4, 2018, Plaintiff presented complaining of cold and cough symptoms.  A nurse practitioner diagnosed Plaintiff with chronic bronchitis.

In follow-up treatment on April 5, 2019, Plaintiff reported experiencing anxiety after finding her husband dead and requested a prescription medication.

### F.      **Consultative Examination – Dr. Mara Horwitz** (Tr. 407-14)

On September 21, 2019, Dr. Mara Horwitz completed a consultative medical report. Plaintiff's neurological examination showed Plaintiff's mood to be mildly anxious but otherwise appropriate, and Plaintiff had clear thought processes; her memory was normal and concentration good; and she was oriented to time, person, and situation.  Dr. Horwitz documented that Plaintiff had life stressors.  Dr. Horwitz found Plaintiff to be mildly anxious during her examination, but otherwise

Plaintiff had an appropriate mood and affect.

### G.      **Hannibal Clinic Operations -Dr. Barbara Turley and Stephen Halpin** (Tr. 437-85)

Between February 4 and June 17, 2020, Drs. Barbara Turley and Stephen Halpin provided Plaintiff primary medical care.

On February 4, 2020, Plaintiff presented to establish primary care with Dr. Turley and reported being type II diabetic, but she neither followed her diet nor checked her blood sugars. Plaintiff complained of chronic neck pain.  Dr. Turley discussed following a regular walking program to help Plaintiff's diabetic sugar control.  Dr. Turley's depression screening showed clinically significant symptoms, including poor appetite or overeating, little interest in doing anything, feeling depressed and hopeless, feeling bad about herself, trouble sleeping and concentrating, and little energy.  Dr. Turley provided Plaintiff with range of motion exercises and dietary counseling and continued Plaintiff's medication regimen.  An x-ray of Plaintiff's cervical spine showed disc degenerative disease and facet arthritis at her lumbosacral spine.

In follow-up treatment on March 3, 2020, Dr. Turley opined that Plaintiff was chronically on oxycodone and explained that "[s]he of course cannot tell me her medication list again.  We obtained her medication list from her local pharmacy and found that a lot of the medications that were posted last visit were wrong.  From that medication list we could see that she was getting 180 tablets of oxycodone per month from Dr. Wells.  She was also on clonazepam and Adderall.  I had given her prescription of 60 oxycodone 5 mg tablets to take twice a day." (Tr. 454)  Dr. Turley expressed her concern about Plaintiff taking multiple controlled substances, clonazepam and an opioid narcotic.  Dr. Turley requested lab work to be completed, but Plaintiff failed to complete the lab work.  Dr. Turley noted that Plaintiff exhibited some drug-seeking behavior by talking on her phone to the pharmacy and requesting a diagnosis code for her oxycodone and appearing very anxious and somewhat appropriate.

On April 29, 2020, Plaintiff presented to Dr. Halpin to reestablish care as her primary care physician after fourteen years.  An x-ray of her scapula showed no evidence of a scapular fracture. Dr. Halpin found her scapular pain to be muscular due to the normal x-ray findings.  Dr. Halpin

assessed Plaintiff with degenerative disc disease, facet osteoarthritis of her spine, chronic narcotic use for nine years, narcotics dependency disorder, diabetes mellitus poorly controlled, hyperlipemia secondary to her poorly controlled diabetes, and vitamin D deficiency.  Although Dr. Halpin agreed to prescribe oxycodone, he ordered Plaintiff to taper her dosage to 5 mg, three times a day.

On June 17, 2020, Dr. Carroll Boxerman treated Plaintiff's pain from a motor vehicle accident.  An x-ray of Plaintiff's cervical spine showed no acute osscous abnormality and mild left osscous neuroforaminal narrowing C3-4 and C4-5.  An x-ray of her lumbar spine showed mild lumbar sypondylosis with no acute abnormality.  The tests were ordered due to Plaintiff's pain since the car accident.  Dr. Boxerman found Plaintiff to have lumbago with lumbar muscle strain. Dr. Boxerman instructed Plaintiff to take over-the-counter NSAIDS with food for several days.

### H    Assante Three Rivers Medical Center Radiology Reports (Tr. 593-637)

An September 22, 2014, MRI of Plaintiff's cervical spine showed minimal lower cervical degenerative changes and early lumbar degenerative disc disease.

## III.    Opinion Evidence (Tr. 97-113, 115-31, 589-91)

### A.    Medical Source Statement of Ability to Do-Work Related Activities  (Tr. 589-91)

On August 10, 2020, Dr. Spalding completed a Medical Source Statement of Ability to Do-Work Related Activities (Mental) form.  (Tr. 589-91)  Dr. Spalding found Plaintiff would have marked limitations in the ability to understand and remember simple instructions, carry out simple instructions, and in the ability to make judgments on simple work-related decisions.  In support, Dr. Spalding opined "[Plaintiff] suffers from Bipolar Disorder, Post Traumatic Stress Disorder, Panic Disorder, as well as ADHD.  Her severe symptoms include panic attacks, mood swings, depressed mood, anhedonia, agoraphobia, racing thoughts, problems with sleep, appetite and

10

energy." (Tr. 509) Dr. Spalding further opined that Plaintiff would have extreme impairments in the ability to interact appropriately with the public and coworkers, and to respond appropriately to usual work situations and to change in a routine work setting. In support, Dr. Spalding opined that Plaintiff "has severe panic and mood symptoms that severely impact her ability to work in any capacity." Dr. Spalding further opined that Plaintiff would be off task more than four days per month and 25% of the workday, and Plaintiff would need extensive, unplanned breaks, two to three times each week, lasting four to eight hours due to panic attacks, crying spells, anxiety, depression, and flashbacks. (Tr. 590-91)

## B. **Mental Residual Functional Capacity Assessment** (Tr. 97-113, 115-31)

Dr. Martin Isenberg, Ph.D., a non-examining state agency consultant, reviewed Plaintiff's records and provided an opinion on August 26, 2019, as part of the initial review of Plaintiff's file. Dr. Isenberg concluded that Plaintiff had moderate limitations in all four areas of mental functioning, including understanding, remembering, or applying information; concentrating, persisting, and maintaining pace; interacting with others; and adapting and managing oneself. Functionally, Dr. Isenberg suggested that Plaintiff retained the ability to understand, remember and carryout simple instructions; maintain adequate attendance; and sustain an ordinary routine without special supervision; that Plaintiff can adequately interact with peers and supervisors; and Plaintiff can adapt to most usual changes common to a competitive work setting.

## IV. **The Hearing Before the ALJ**

The ALJ conducted a telephone hearing on August 12, 2020. Plaintiff participated in the telephone hearing with an attorney and testified. The VE also testified.

### A. **Plaintiff's Testimony**

Plaintiff testified that she lives with her disabled boyfriend in her mobile home. (Tr. 50,

53)  Plaintiff reconnected with her boyfriend on Facebook, and then they started dating in January 2020.  (Tr. 53)  Before she started living with her boyfriend, Plaintiff slept at her sister's house. (Tr. 54)  Plaintiff cared for her grandsons, ages eight and one year, for over two years with her sister's assistance while their mother was incarcerated.  (Tr. 83)

Plaintiff testified that her sister helps with household chores.  Plaintiff cooks meals in the microwave and does the laundry and the grocery shopping.  (Tr. 51)  Plaintiff explained that she is better with her diabetic diet and consumes six to eight beers four times a week even though alcohol harms her blood sugars.  (Tr. 52)  She has a driver's license with no restrictions.  Plaintiff attends her grandchildren's sporting events once a week.  (Tr. 76)

Plaintiff last worked in November 2017 in a prison but was fired for passing a note from one prisoner to another prisoner.  (Tr. 55)  Plaintiff explained that she believed she was really terminated because of her mood swings, agitation, and inability to get along with others, including arguing with coworkers and supervisors in a raised voice.  (Tr. 55)

Plaintiff testified that she has a bipolar diagnosis, and she experiences cycling depressive and manic episodes.  (Tr. 56)  When in a manic episode for two weeks each month, Plaintiff steals from stores a couple times a month, and she cannot sleep.  (Tr. 56)  Plaintiff also experiences mood swings five to ten times each week during a manic episode, and she cannot get along with her boyfriend and her sister.  (Tr. 57)  Plaintiff testified that she also has depressive phases for a week at a time, causing her to have crying spells all day.  (Tr. 58)  Plaintiff testified that her PTSD stemmed from being placed in a locked outhouse for a couple of hours as a child by her grandmother as punishment, and being molested by her uncle and a babysitter, and being married to an abusive, drug addicted husband.  (Tr. 61)  Plaintiff explained that she experiences flashbacks, two to three times a week stemming from these experiences.  (Tr. 62)  Plaintiff testified that she

12

cuts her legs, arms, and stomach to relieve her pain once a month.  (Tr. 66)  Plaintiff's anxiety attacks result in breathing problems, but once she started clonazepam, she experiences  anxiety attacks a couple times a month instead of daily attacks.  Plaintiff testified that crowded stores and her memories cause her to experience general anxiety.  (Tr. 70)

A psychiatrist treats Plaintiff's PTSD twice a month and prescribes trazadone, and a counselor treats her once a week.  (Tr. 63-64)  Plaintiff explained that she did not take any medications for two years because she could not afford to go to a doctor.  The ALJ asked Plaintiff why she elected to consume 64 ounces of strawberry daiquiris and sweet tea each day instead of using the money to pay for medical treatment, and Plaintiff responded that she did not have an answer.  Plaintiff admitted that she uses alcohol as a form of treatment.

### B.    The VE's Testimony

The VE identified Plaintiff's past work as a customer service representative, a dispatcher, and a jailer.  (Tr. 86)

The ALJ asked the VE a series of hypothetical questions to determine whether someone Plaintiff's age, at least a high school education, work experience, a younger individual who is now closely approaching advanced age, and specific functional limitations would be able to perform a light exertional level job.  First, the ALJ asked the VE to assume a hypothetical individual who is limited to simple, routine tasks, working with objects rather than people; no direct interaction with the public, the public may be present, but no job tasks requiring interaction with the public; causal and infrequent interaction with coworkers with no tandem tasks, and after the initial training or probationary period, limited to occasional interaction with supervisors.  (Tr. 87)  The VE responded that such hypothetical person would not be able to perform Plaintiff's past work as a customer service representative, a dispatcher, or a jailor, but there would be other work such as a

housekeeping cleaner, a photocopy machine operator, a mail sorter, and a price marker, with the mail sorter and price marker jobs allowing for a change of position every thirty to sixty minutes. (Tr. 89)

Next, the ALJ asked the VE the number of absences a person could take each year.  The VE explained an absence of one day per month would usually be acceptable or ten to twelve days per year.  (Tr. 89)  The ALJ also asked the amount of time a person could be off task.  The VE explained that employers expect employees to be on-task at all times, except for a ten to fifteen minute break in the morning and afternoon and then either a half hour or an hour lunch break, but if the employee was off-task at other times, the employee would be subject to termination.  (Tr. 90)

Counsel asked if the individual in either hypothetical would fall asleep at the work station, could the individual work any jobs.  (Tr. 94)  The VE indicated that such employee would be terminated.  Next, counsel asked what would happen if the individual raised her voice in an angry manner at a coworker or supervisor.  The VE opined that an employer might allow this to happen once or twice, but if the individual continued to raise her voice that would be cause for termination.

## V.    The ALJ's Decision

In a decision dated September 28, 2020, the ALJ determined that Plaintiff was not disabled under the Social Security Act.  (Tr. 15-32)

The ALJ determined that Plaintiff had severe impairments of diabetes with peripheral neuropathy, degenerative disc disease, affective disorder (variously diagnosed as bipolar disorder or depression), anxiety disorder, attention deficit/hyperactivity disorder, and PTSD.  (Tr. 18)  The ALJ determined that Plaintiff had the residual functional capacity to perform light work with the following modifications:  (1) she is limited to simple, routine tasks; (2) she should work with

14

objects rather than people; (3) she should have no direct interaction with the public; (4) she is limited to casual and infrequent interaction with coworkers, involving no tandem tasks; and (5) she is limited to occasional interaction with supervisors once she completes the initial training and/or probationary period.  (Tr. 20-30)

The ALJ identified that Plaintiff's past relevant work as a customer service representative and a jailor.  (Tr. 30)  The ALJ found, based on the VE's testimony, that Plaintiff could perform the demands of light work and perform the requirements of a housekeeper/cleaner, a mail sorter, a price marker, and a photocopy machine operator.  (Tr. 31)  Therefore, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act.

The ALJ's decision is discussed in additional detail below.

## VI.    Standard of Review and Legal Framework

"To be eligible for … benefits, [Plaintiff] must prove that she is disabled …."  Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); see also Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A).  A plaintiff will be found to have a disability "only if her physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A) and 1382c(a)(3)(B).  See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

"To receive disability benefits, [Plaintiff] must establish a physical impairment lasting at least one year that prevents her from engaging in any gainful activity." Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).

Per regulations promulgated by the Commissioner, 20 C.F.R § 404.1520, "[t]he ALJ follows 'the familiar five-step process' to determine whether an individual is disabled…. The ALJ consider[s] whether:  (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." Martise v. Astrue, 641 F.3d 909, 921 (8th Cir. 2011) (quoting Halverson v. Astrue, 600 F.3d 922, 929 (8th Cir. 2010)). See also Bowen, 482 U.S. at 140-42 (explaining the five-step process).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)).  The ALJ's findings should be affirmed if they are supported by "substantial evidence" on the record as a whole.  See Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008).  Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 596 F.3d 959, 965 (8th Cir. 2010) (same).

Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).  The district court must "also take into account whatever in the record fairly detracts from that decision." Id.  Specifically, in reviewing

the Commissioner's decision, a district court is required to examine the entire administrative record and consider:

1.   The credibility findings made by the ALJ.

2.   The claimant's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The claimant's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of the claimant's impairments.

6.   The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (citation omitted).

Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011).  A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance.  Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

**VII.   <u>Analysis of Issues Presented</u>**

In her brief to this Court, Plaintiff raises two points of error, that the ALJ erred in discounting her treating psychiatrist's opinion evidence, and the RFC is not supported by the weight of the evidence.  In response, Defendant argues that the ALJ properly evaluated Dr. Spalding's opinion evidence, and the RFC is supported by substantial evidence.

A.    **Dr. Spalding's Opinion Evidence**

Plaintiff argues that the ALJ failed to properly weigh the medical opinion evidence by not fully considering the factors governing treating physicians set forth in § 404.1520.  Plaintiff contends that Dr. Spalding was her treating, board-certified psychiatrist, and the ALJ accorded his opinion little weight without offering sufficient reason.  Plaintiff also argues that "[t]he ALJ is not a physician and cannot just reject opinion evidence out of hand" and that "the ALJ is not medically trained and is not supposed to be making medical conclusions."  (ECF No. 15 at p.18)

The record contains two medical opinions that discuss Plaintiff's mental health.  Given that Plaintiff filed her application after March 27, 2017, the new Social Security regulations regarding the evaluation of medical opinion evidence applied to her case.  20 C.F.R. § 404.1520c.  Under the new regulations, an ALJ is no longer required to "give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," including those from treating physicians. 20 C.F.R. 404.1520(a).  Instead, the ALJ is to consider all medical opinions equally and evaluate their persuasiveness according to several specific factors.  20 C.F.R. § 404,1520(b)(2).  An ALJ must explain how she considered the factors of supportability and consistency in her decision, but need not explain how she considered the other factors.   20 C.F.R.  § 1520c(b)(2).   The supportability factor provides that "[t]he more relevant the objective evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404,1520c(c)(1).  The consistency factor states that "[t]he more consistent a medical opinion(s) or prior administrative finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520(c)(2).

On August 10, 2020, one month after he last treated Plaintiff, Dr. Spalding completed a

18

three-page form titled "Medical Assessment Mental Ability – Work Related Activities."  (Tr. 589-92)  Dr. Spalding found Plaintiff would have marked limitations in the ability to understand and remember simple instructions, carry out simple instructions, and in the ability to make judgments on simple work-related decisions.  In support, Dr. Spalding opined "[Plaintiff] suffers from Bipolar Disorder, Post Traumatic Stress Disorder, Panic Disorder, as well as ADHD.  Her severe symptoms include panic attacks, mood swings, depressed mood, anhedonia, agoraphobia, racing thoughts, problems with sleep, appetite and energy."  (Tr. 509)  Dr. Spalding further opined that Plaintiff would have extreme impairments in the ability to interact appropriately with the public and coworkers, and to respond appropriately to usual work situations and to change in a routine work setting.  In support, Dr. Spalding opined that Plaintiff "has severe panic and mood symptoms that severely impact her ability to work in any capacity."  Dr. Spalding further opined that Plaintiff would be off task more than four days per month and 25% of the workday, and Plaintiff would need extensive, unplanned breaks, two to three times each week, lasting four to eight hours due to panic attacks, crying spells, anxiety, depression, and flashbacks.  (Tr. 590-91)

Because the regulations eliminated the treating physician rule, the ALJ was not obligated to give any special weight to Dr. Spalding's opinion.  The Court finds that the ALJ did not err in evaluating the persuasiveness of Dr. Spalding's opinion in that she considered the opinion's supportability.  In articulating how she considered the supportability factor, an ALJ may note that the physician's own treatment notes do not support the physician's opinion, that the physician's opinion stems from a checklist, that the physician did not consider certain evidence, that the physician did not examine the claimant, or that the physician did or did not provide a detailed explanation for the opinion.  Starman v. Kijakazi, 2021 WL 4459720, at *4 (E.D. Mo. Sept. 29, 2021) (listing cases).

19

The ALJ found Dr. Spalding's opinion not supported by his explanations and own treatment records, as well as inconsistent with the record as a whole.  Here, the ALJ properly noted that Dr. Spalding's own treatment notes do not support his extreme limitations in his opinion.  The undersigned notes that the more severe limitations that would prevent Plaintiff  from working appear for the first time in Dr. Spalding's check-box form opinion.  In contrast, the medical record shows that Dr. Spalding consistently noted that Plaintiff had normal eye contact, appropriate behavior, was cooperative, and had no hallucinations, psychosis, or paranoia.  Further, Dr. Spalding noted that there was no indication Plaintiff presented any danger to herself or others, requiring psychiatric hospitalization or intensive outpatient treatment.[1]  As to Plaintiff's alleged inability to interact with others, the ALJ noted that Plaintiff reported being a caregiver to her young grandchildren for more than a year, spending time with her sister, going to a family reunion, spending time with friends at home, going to stores and sporting events, interacting on social media, and reconnecting with an old friend romantically, all demonstrated Plaintiff's abilities to interact with others appropriately.  Regarding Dr. Spalding's suggestion that Plaintiff has a marked limitation with respect to understanding, remembering, and carrying out simple instructions and decisions, the ALJ noted that Dr. Spalding's treatment notes consistently found no cognitive or intellectual limitations, and his objective observations were relatively unremarkable.

---

[1] Plaintiff objects to the ALJ's reliance on the fact that Plaintiff did not require psychiatric hospitalization or intensive outpatient treatment.  Plaintiff is correct that the law does not require an individual to seek emergency room treatment for her allegations to be supported by the record. See Bland v. Saul, 2020 WL 1929786, at *8 (E.D. Mo. Apr. 21, 2020) (finding the ALJ erred by discounting disability evidence because Plaintiff was never hospitalized or needed emergency treatment because "[a] claimant is not required to be hospitalized to be found disabled") (citing Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005)).  But the ALJ here did not rely solely on a lack of hospitalization or emergent treatment.  Rather, and appropriately, the ALJ relied on the entire treatment record and Plaintiff's own activities.

The record shows that Dr. Spalding did not examine Plaintiff on the date he completed the opinion, and a review of the opinion shows that Dr. Spalding did not provide a detailed explanation for the opinion.  The Court further notes that Dr. Spalding's opinion stems from a checklist.  See Swarthout v. Kijakazi, 35 F.4th 608, 611 (8th Cir. May 20, 2022) (finding physician's opinion entitled to relatively little evidentiary weight on its face, because it was rendered on a check-box and fill-in-the-blank form.").  The ALJ properly addressed the consistency and supportability factors in assessing the persuasiveness of Dr. Spalding's opinion by finding that Dr. Spalding's "opinion was not persuasive, as it is neither supported by Dr. Spalding's explanations and treatment records, nor is it consistent with the record as a whole, including [Plaintiff's] own reports."  (Tr. 28)

After careful review of the record, the Court finds that the ALJ reasonably articulated why she found Dr. Spalding's opinion unpersuasive because it was unsupported by Dr. Spalding's own treatment notes and inconsistent with the objective medical evidence and the record as a whole, and her finding falls within the available "zone of choice."  Buckner, 646 F.3d at 556 (in weighing a treating source opinion, it is the ALJ's role to resolve conflicts in the evidence, and the ALJ's finding should not be disturbed so long as it falls with the "available zone of choice.").  Accordingly, the Court finds that the ALJ did not err when evaluating Dr. Spalding's medical opinion evidence because the ALJ strictly followed the requirements of the statute and gave ample explanation in her decision.  20 C.F.R. § 404.1520.

Further, Dr. Spalding treated Plaintiff a total of thirteen times between May 9, 2019 and July 1, 2020, one psychiatric evaluation and twelve office visits, each lasting on average eighteen minutes. Plaintiff received routine and conservative treatment, including outpatient visits, medication management, and routine counseling.  See Robinson v. Sullivan,, 956 F.2d 836, 840

(8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain).  "Claims of disabling symptoms may be discredited when the record reflects minimal or conservative treatment."  Brown v. Astrue, 2012 WL 8868789, *14 (E.D. Mo. Mar. 15, 2012); see also Reece v. Colvin, 834 F.3d 904, 909 (8th Cir. 2016) (affirming claimant was not disabled, in part, because claimant's treatment was routine and conservative.).  Treatment that does not involve more aggressive treatments than appointments with a psychiatrist, therapy, and prescription medications is routine.  Rivers v. Saul, 2022 WL 1080937, at *13 (E.D. Mo. Apr. 11, 2022).  Although the fact that Plaintiff did not receive inpatient treatment is not dispositive, the lack of hospitalization supports her treatment was routine and conservative.  See Fritzke v. Colvin, 2015 WL 12781200, at *14 (D. Minn. Mar, 2, 2015); see also Wise v. Astrue, 2012 WL 3156763, at *4 (W.D. Mo. Aug. 2, 2012) (affirming the claimant's treatment, which included outpatient visits and psychiatric medications, was routine and conservative treatment for her depression and anxiety.).  Routine or conservative treatment supports a finding that a claimant is not disabled.

The Court further finds that the ALJ did not err in evaluating the persuasiveness of Dr. Isenberg's opinion.  Plaintiff does not specifically explain how she believes that the ALJ erred in analyzing this opinion.  In her brief, Plaintiff simply contends that is not clear what records Dr. Isenberg reviewed.  A review of the administrative transcript shows that Dr. Isenberg, in relevant part, reviewed Dr. Spalding's treatment notes dated May 9, June 7, and July 10, 2019.  (Tr. 101, 104)  The ALJ acknowledged that Dr. Isenberg provided his opinion prior to the receipt of all the evidence received at the hearing level and failed to account for subsequent developments, the ALJ found that the opinion was generally persuasive and continued to accurately reflect Plaintiff's current situation when considered with the new evidence.  The ALJ opined that Dr. Isenberg's opinion was well supported by his narrative opinion and citations to the medical evidence, and his

22

limitations were consistent with Dr. Spalding's own treatment records, showing Plaintiff's mental status examinations were otherwise relatively stable and unremarkable, with no indication of psychosis or paranoia.  The ALJ further opined that a moderate limitation in functioning is more consistent with Plaintiff's reported activities of daily living, including providing childcare for her young grandchildren for more than one year, doing household chores, shopping in stores, attending family reunions and grandchildren sporting events, interacted on social media, and reconnected with an old friend romantically.  See, e.g., Thomas v. Berryhill, 881 F.3d 672, 676 (8th Cir. 2018) (claimant's self-reported activities of caring for young son, preparing his meals, doing housework, shopping for groceries, handling money, watching television, and driving a car when necessary showed that claimant could work.).  The Court finds that Dr. Isenberg's opinion demonstrates adequate consideration of the evidence in the record when formulating his RFC conclusions and consistent with Dr. Spalding's treatment notes, showing Plaintiff's mental status examinations were otherwise relatively stable and unremarkable, except for anxious or depressed mood.  For the foregoing reasons, the undersigned finds that the ALJ did not err in her evaluation of Dr. Isenberg's opinion because the ALJ properly found Dr. Isenberg's opinion was persuasive because it was consistent with the medical evidence as a whole.  See Adamczyk v. Saul, 817 F.App'x 287, 290 (8th Cir. 2020) (citing Hacker v. Barnhart, 459 F.3d 934, 939 (8th Cir. 2006) (finding that opinions of nonexamining, reviewing psychologists were consistent with evidence that arose after those psychologists wrote their opinions.).  Further, Plaintiff does not point out any subsequent medical evidence inconsistent with Dr. Isenberg's opinion.

Lastly, Plaintiff's argument that "[t]he ALJ is not a physician and cannot just reject opinion evidence out of hand" and that "the ALJ is not medically trained and is not supposed to be making medical conclusions is correct that the "ALJ cannot 'play doctor'  meaning that the ALJ cannot

draw improper references from the record or substitute a doctor's opinion for his own." Adamcyzk, 817 F. App'x at 289 (citing Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009) ("[T]he ALJ's determination [that the claimant's] medical noncompliance is attributable solely to free will is tantamount to the ALJ 'playing doctor,' a practice forbidden by law."); Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir. 1975) ("An administrative law judge may not draw upon his own inferences from medical reports.")). However, "[t]he interpretation of physicians' findings is a factual matter left to the ALJ's authority." Marby v. Colvin, 815 F.3d 386, 391 (8th Cir. 2016). Here, the ALJ was clearly not playing doctor as Plaintiff claims. Rather, in finding Dr. Spalding's opinion not persuasive, the ALJ acceptably pointed out why she found the doctor's opinion was not supported by, and inconsistent, with the entire record.

### B.   RFC Determination

Plaintiff next argues that the ALJ's RFC determination is not supported by the weight of the evidence.

A claimant's RFC is the most an individual can do despite the combined effects of his credible limitations. See 20 C.F.R. § 404.1545. "The RFC 'is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." Roberson v. Astrue, 481 F.3d 1020, 1023 (8th Cir. 2007) (quoting SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996)). An ALJ's RFC finding is based on all of the record evidence, the claimant's testimony regarding symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence. See Wildman, 596 F.3d at 969; see also 20 C.F.R. § 404.1545; SSR 96-8p (listing factors to be considered when assessing a claimant's RFC, including medical source statements, recorded observations, and "effects of symptoms … that are reasonably attributed to a medically determinable impairment."). The ALJ must explain his assessment of the RFC with

24

specific references to the record.  SSR 96-8 (the RFC assessment must cite "specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)" in describing how the evidence supports each conclusion).  Throughout this inquiry, the burden of persuasion to prove disability and to demonstrate RFC is on the claimant.  Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016).  Disability is not determined by the presence of impairments, but by the effect the impairments have on the individual's ability to perform substantial gainful activity.  20 C.F.R. §§ 404.1545(e), 416.945(e).

"It is the claimant's burden, and not the Social Security Commissioner's burden to prove the claimant's RFC."  Pearsall, 274 F.3d at 1217.  Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by substantial medical evidence that Plaintiff could perform the requirements of competitive work without having his pain result in impermissible levels of off-task behavior such as lying down and absenteeism.  See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ concluded that Plaintiff had the following limitations due to her mental impairments: limited to simple, routine tasks; should work with objects, rather than people; should have no direct interaction with the public; limited to casual and infrequent interaction with coworkers involving no tandem tasks; and limited to occasional interaction with supervisors after the initial training and/or probationary period.

In her decision, the ALJ opined as follows:

> … As far as her mental impairments, [Plaintiff] alleged that she had trouble getting along with others because mood swings from bipolar disorder which caused her to be agitated when manic and crying when depressed. (Testimony)  She testified that about two or three times per month during manic phases she will steal from stores. (Testimony)  [Plaintiff] testified to anxiety around other people and panic attacks. She further testified that she went to the store during off hours and although she went to her grandchildren's spring events/games, she sometimes left early or stayed in the doorway because of difficulty interacting with others.   [Plaintiff]

acknowledged having taken custody of her young grandchildren from September 2016 to December 2018, but indicated that she had help from her mother, sister, and the children's father, although none of those individuals were fit/able to take custody.  [Plaintiff] alleged she had issues with her mental impairments for several years, and suffered from PTSD due to childhood abuse/trauma, and her mental issues worsened after her husband died in April 2019.  (Testimony)  Finally, [Plaintiff] admitted to drinking alcohol several times per week, despite the negative impact on her diabetes/blood sugar, alleging she use drinking as a means of escape and self-medication.  (Testimony)

(Tr. 21)

An ALJ may discount a plaintiff's subjective complaints if there are inconsistencies in the record as a whole as long at the ALJ explicitly discredits a plaintiff's testimony and gives a good reason for doing so.  Wildman, 596 F.3d at 968.[2]  Here, the ALJ concluded that, while Plaintiff's "medically determinable impairments could reasonably cause the alleged reported symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record…."  (Tr. 22)  Specifically, the ALJ found that the evidence did not support Plaintiff's claims of racing thoughts and problems with hyperactivity and inattention; difficulty with depression; and irritability and difficulty getting along with others.

_____

[2] Assessing a Social Security claimant's subjective complaints "is a matter properly within the purview of the ALJ."  Chaney v. Colvin, 812 F.3d 672, 676 (8th Cir. 2016) (citing Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003)).  The ALJ is not required to credit the claimant's subjective complaints when they are inconsistent with the record as a whole.  See Lawrence v. Saul, 970 F.3d 989, 995 n.6 (8th Cir. 2020); Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).

> In Social Security Rule 16-3p, the Commissioner largely eliminated the use of the term 'credibility' and clarifies that the Commissioner's review of subjective assertions of the severity of the symptoms is not an examination of a claimant's character, but rather, is an examination for the level of consistency between the subjective assertions and the balance of the record as a whole….  [I]t largely changes terminology rather than the substantive analysis to be applied.

Lawrence, 970 F.3d at 995 n,6.  To make this assessment, the ALJ considers a variety of factors.  See Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (listing factors); 20 C.F.R. § 404.1529(c)(3).  But the ALJ is not required to explicitly discuss each factor.  See Schwandt v. Berryhill, 926 F.3d 1004, 1012 (8th Cir. 2019).

Regarding mental limitations, the ALJ observed that "most of her mental examinations were relatively unremarkable, in that there was not much objective evidence of pressured speech, psychomotor agitation, disorganized thoughts, or preoccupation – other than when [Plaintiff] specifically asking for Adderall.  Further, she reported improvements in her focus and attention with Adderall, such that her provider continued to prescribe the medication."  (Tr. 27)  The ALJ found no evidence in the medical record showing any significant mood lability, irritation, lack of cooperation, hallucinations, delusions or psychosis.  The ALJ noted that the only objective observations of agitation in the record occurred when Plaintiff was informed by her medical provider that she would not prescribe opiate medications, or when Plaintiff was confronted about her drug seeking behavior.  The ALJ found that the objective medical evidence did not document the reported severity of symptoms that Plaintiff alleged.

Indeed, the ALJ explicitly considered Plaintiff's mental impairments in determining the RFC by limiting Plaintiff to simple, routine tasks.  The ALJ further opined that she accounted for Plaintiff's difficulty interacting with other people by working in a job where she primarily works with objects rather than people; having only casual and infrequent interaction with coworkers; not be assigned any tandem tasks; only occasional interaction with supervisors during the initial training period; and limiting her to no direct interaction with public and coworker/supervisor interaction.  Despite Plaintiff's hearing testimony that her mental impairments would preclude her from working, substantial medical evidence supports the ALJ's RFC determination. The undersigned finds that the ALJ determined Plaintiff's RFC by considering "all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations."  Myers v. Colvin, 721 F.3d 521, 527 (8th Cir. 2013).

Finally, apart perhaps from the conclusory information in  Dr. Spalding's MSS which is addressed at length above, no treating or examining source ever indicated that Plaintiff was disabled or unable to work or imposed functional limitations on Plaintiff's capacity for work.  See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2009) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find a disability a factor in discrediting subjective complaints).  Plaintiff's treating sources never placed any meaningful restrictions on Plaintiff.  To the contrary, doctors encouraged Plaintiff to be more physically active.  See Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2004).

**VIII.   Conclusion**

When reviewing an adverse decision by the Commissioner, the Court's task is to determine whether the decision is supported by substantial evidence on the record as a whole.  Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001).  "Substantial evidence is defined to include such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion.  Id. Where substantial evidence supports the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently.  Id.; see also Igo v. Colvin, 839 F.3d 724, 728 (8th Cir. 2016).  For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.  See Finch, 547 F.3d at 935.  Similarly, the Court cannot say that the ALJ's determinations in this regard fall outside the available "zone of choice," defined by the record in this case.  See Buckner, 646 F.3d at 556.  For the reasons set forth above, the Commissioner's decision denying benefits is affirmed. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 9th day of August, 2022.

/s/ John M. Bodenhausen
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE